UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
*Rosset Family Legacy Holdings LLC v. Oakes*
No. 1:25-cv-09398-LAP

# EXHIBIT B

*Prime Entertainment Group LLC v. 43 North Broadway, LLC*
No. 25cv6329 (DLC), 2026 WL 1329491 (S.D.N.Y. May 13, 2026)

2026 WL 1329491
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

PRIME ENTERTAINMENT GROUP LLC, Plaintiff,
v.
43 NORTH BROADWAY, LLC, et al., Defendants.

25cv6329 (DLC)
|
Signed 05/13/2026

**Attorneys and Law Firms**

For plaintiff: Alberto J. Soler, Ajoe P. Abraham, Soler Salva LLP, 270 W 39th St., Suite 1304, New York, NY 10018.

For defendant: Lisa A. Ferrari, Keren Dadon, Cozen O'Connor, 3 WTC, 175 Greenwich St., 55th Fl., New York, NY 10007.

OPINION AND ORDER

DENISE COTE, District Judge:

***1** This case concerns defendant 43 North Broadway, LLC's ("43 North") failure to pay royalties allegedly owed to plaintiff Prime Entertainment Group LLC ("Prime" or "PEG") and non-party Gulf Coast Music LLC ("Gulf Coast" or "GCM") for its exploitation of certain sound recordings. 43 North has moved to dismiss the First Amended Complaint ("FAC") in its entirety pursuant to Rule 12(b)(6), Fed. R. Civ. P., and to dismiss Counts II and IV in particular pursuant to Rule 12(b)(1), Fed. R. Civ. P., for lack of standing. For the following reasons, the motion is granted in part.

**Background**

This case involves a series of agreements entered into between 2000 and 2015, and questions surrounding how they interact. The facts that follow are drawn from the FAC and from documents referenced in the FAC and attached to the Declaration of Leonard Fico, which Prime filed in opposition to 43 North's motion to dismiss.[1] As Prime acknowledges, the action does not involve any dispute over copyright ownership; rather, Prime pleads that 43 North has breached its contractual royalty-payment obligations as to certain licensed recordings by failing to pay Prime and non-party Gulf Coast amounts they are owed.

Prime is an authorized licensing and sales agent for several highly valuable sound recording catalogs -- including its own (the "PEG Catalog") and a set of catalogs owned by non-party Gulf Coast (the "GCM Catalog"). On November 30, 2000, Prime and Gulf Coast entered into an Appointment of Sales Agent Agreement (the "Sales Agent Agreement") establishing Prime as Gulf Coast's "duly authorized and appointed agent" and "nonexclusive sales representative ... with the authority to seek out opportunities to license any and all of the master sound recordings" in the GCM Catalog. As compensation, Prime is entitled to fifty percent (50%) of the net profits that Gulf Coast earns from any third-party licenses that Prime secures. The Sales Agent Agreement provides that any third-party licenses "made pursuant to" it may be "enforced by [Gulf Coast] or [Prime] and all recoveries (net of attorney's fees and costs) shall be treated as any other revenues occurring" under the Agreement.

In 2001 and 2002, Prime and Gulf Coast each entered into agreements with non-party Fuel 2000 Records, Inc. ("F2K").[2] First, on March 31, 2001, Gulf Coast entered into a License Agreement with F2K (the "GCM-F2K License Agreement"). Under that agreement, F2K obtained the exclusive right to manufacture physical sound recordings in the GCM Catalog, as well as the non-exclusive right to use and license those recordings in non-physical forms throughout the world, in exchange for royalties payable to Gulf Coast. For physical products, F2K agreed to pay Gulf Coast royalties based on suggested retail sale prices, and for digital uses, F2K agreed to pay Gulf Coast a royalty equal to fifty percent (50%) of its revenues derived from those uses.

***2** Next, on March 1, 2002, Prime and F2K entered into an Asset Purchase Agreement (the "PEG-F2K APA") pursuant to which Prime sold F2K its library of "non-exclusive musical masters." In exchange, Prime was entitled to a perpetual fifty percent (50%) participation in the net receipts arising from F2K's exploitation of those recordings. The PEG-F2K APA was binding on F2K's successors and assigns.

Pursuant to an October 13, 2015 Asset Purchase Agreement (the "43 North–F2K APA"), F2K then sold defendant 43

North rights to its sound recording assets for $1.3 million. Section 1.01(a) of that agreement provides that 43 North acquired F2K's interests in "[t]he sound recordings owned, controlled, or licensed by" F2K, as set forth in Schedules A, A-1, and A-2 to the APA, with Schedule A-2 specifically identifying the masters that F2K had licensed in perpetuity but did not own. Pursuant to §§ 1.01(b)–(d) and 5.03(a), and to a separate Assignment and Assumption Agreement appended as an exhibit, 43 North also assumed F2K's pre-existing and ongoing contractual obligations to third parties, including Prime, Gulf Coast, and various other royalty recipients. A contemporaneous letter of October 13, 2015 from F2K to 43 North confirmed that 43 North would be "solely responsible for and pay all royalties due to the respective artists (or entities on their behalf)" and would do so "as part of its royalty accountings for the semi-annual period."

In 2017, Prime and 43 North engaged in negotiations regarding 43 North's compliance with its royalty obligations. Prime alleges that, in a May 10, 2017 email transmitting a draft agreement, counsel for 43 North acknowledged that 43 North owed royalties and proposed payment of a $25,000 advance "against all royalties and any other sums due to [Prime] pursuant to all the Agreements between Prime/Gulf and 43 North." According to Prime, 43 North did not honor that commitment, and no resolution was reached. Prime alleges that 43 North has continued to exploit licensed recordings without rendering royalty statements or paying royalties to Prime or Gulf Coast since at least 2019.

Prime filed this action on July 31, 2025. In response to a November 24 motion to dismiss, Prime filed the First Amended Complaint ("FAC") on January 5, 2026.[3] In the FAC, Prime asserts two breach-of-contract claims -- one as a third-party beneficiary of the 43 North–F2K APA with respect to the PEG Catalog (Count I), and one as both a third-party beneficiary of the 43 North-F2K APA and as Gulf Coast's authorized licensing agent with respect to the GCM Catalog (Count II). Count II seeks to recover damages on behalf of GCM. Prime also brings parallel unjust-enrichment claims pleaded in the alternative (Counts III and IV). 43 North renewed its motion to dismiss on January 28, 2026 under Rules 12(b)(1) and 12(b)(6), Fed. R. Civ. P. The motion became fully submitted on March 4, 2026.

## Discussion

For the purposes of a motion to dismiss under Fed. R. Civ. P. 12(b)(1) for lack of standing, the plaintiff bears the burden of alleging facts that "affirmatively and plausibly suggest that it has standing to sue." Conn. Parents Union v. Russell-Tucker, 8 F.4th 167, 172 (2d Cir. 2021) (citation omitted). Although all allegations made in the complaint are accepted as true and construed in favor of the plaintiff, a court "need not credit a complaint's conclusory statements without reference to its factual context." Id.

***3** To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." Doe v. Franklin Sq. Free Sch. Dist., 100 F.4th 86, 94 (2d Cir. 2024) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Vengalattore v. Cornell Univ., 36 F.4th 87, 102 (2d Cir. 2022) (quoting Iqbal, 556 U.S. at 678). Again, the court "must accept as true all allegations in the complaint and draw all reasonable inferences in favor of the non-moving party." Doe, 100 F.4th at 94 (citation omitted). But "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (quoting Iqbal, 556 U.S. 678).

43 North makes three arguments in support of its motion to dismiss. First, 43 North argues that Counts II and IV relating to the GCM Catalog must be dismissed because Prime is not the real party in interest under Fed. R. Civ. P. 17(a), and thus lacks standing to sue. Second, 43 North argues that all four state-law claims are preempted by the Copyright Act, 17 U.S.C. § 301. And third, 43 North argues that Counts I and II fail to state a claim because neither Prime nor Gulf Coast is an intended third-party beneficiary of the 43 North–F2K APA. The arguments are addressed in that order. For the reasons that follow, only Counts I and III survive this motion to dismiss.

### I. Standing

First, 43 North argues that Counts II and IV, which seek royalties owed on the GCM Catalog, must be dismissed because Prime is not the real party in interest under Fed. R. Civ. P. 17(a). Prime responds that the Sales Agent Agreement permits Prime to enforce licenses "made pursuant to" it on GCM's behalf. This argument fails.

Rule 17(a)(1), the prudential standing rule, requires that an action "be prosecuted in the name of the real party in interest."

Fed. R. Civ. P. 17(a)(1).[4] Under this rule, a litigant must "assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." B.B. by Rosenthal v. Hochul, 166 F.4th 259, 279 (2d Cir. 2026) (citation omitted). That said, the Rule lists certain categories of parties who may bring suit in their own name on behalf of the real party in interest, including, among others, an administrator, a party with whom or in whose name a contract has been made for another's benefit, and a party authorized by statute. Fed. R. Civ. P. 17(a)(1)(B), (F), (G). Thus, the issue is whether the Sales Agent Agreement provides Prime with authority to sue in its name to vindicate Gulf Coast's right to royalties under any of the avenues recognized by Rule 17(a).[5]

***4** The Sales Agent Agreement appoints Prime as "a duly authorized and appointed agent" and "non-exclusive sales agent" for Gulf Coast "with the authority to seek out opportunities to license" the GCM Catalog. The Agreement further provides that "[e]nforcement of all third-party licenses made pursuant to this authorization may be enforced by [Gulf Coast] or [Prime]." In addition to this permission, the Agreement provides that "all recoveries" from such enforcement "shall be treated as any other revenues occurring" under the Agreement, thereby giving Prime a fifty percent (50%) stake in the enforcement of Gulf Coast's licenses.

By its plain terms, however, that enforcement provision applies only to licenses "made pursuant to [Gulf Coast's] authorization" of Prime as its licensing agent -- that is, licenses Prime secures in its capacity as Gulf Coast's agent. The royalty provision similarly only compensates Prime for licenses "secured by" Prime. But the FAC nowhere alleges that Prime secured or brokered the GCM-F2K License Agreement. It alleges only that "GCM entered into a license agreement with F2K." Moreover, the Sales Agent Agreement expressly contemplates that Gulf Coast may "appoint ... other third parties to act" as its licensing agent. Without an allegation that the GCM-F2K License Agreement was "secured by" or "made pursuant to" Prime's role as Gulf Coast's agent, the Sales Agent Agreement's enforcement clause does not give Prime a right to enforce that license, nor a financial stake in its enforcement.[6]

While Rule 17(a)(3), Fed. R. Civ. P., "prohibits a court from dismissing an action for failure to comply with subsection (a)(1) 'until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action,' " Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.a.r.l, 790 F.3d 411, 420 (2d Cir. 2015) (quoting Fed. R. Civ. P. 17(a)(3)), dismissal of Counts II and IV need not be deferred. 43 North identified this deficiency in its November 24, 2025 motion to dismiss and Prime has had over five months to seek to add Gulf Coast as a party. In opposing this motion, Prime has not suggested that Gulf Coast has any desire to join this action. Accordingly, Counts II and IV are dismissed.

II. Preemption

Next, 43 North argues that Prime's surviving state law claims -- Counts I and III -- must be dismissed as preempted by the Copyright Act. "[T]he Copyright Act preempts state law claims asserting rights equivalent to those protected within the general scope of the statute." Melendez v. Sirius XM Radio, Inc., 50 F.4th 294, 300 (2d Cir. 2022) (citation omitted); see also 17 U.S.C. § 301(a) (express preemption clause). A state law claim is preempted by the Copyright Act if it meets two requirements: a subject matter requirement and a general scope requirement. Melendez, 50 F.4th at 300-01.

"The subject matter requirement of the test is satisfied when the plaintiff's claim applies to a work of authorship ... falling within the ambit of one of the categories of copyrightable works." Id. at 301 (citation omitted). Under § 102(a) of the Copyright Act, "works of authorship" include, among other things, "sound recordings." 17 U.S.C. § 102(a)(7). There is no dispute that the non-exclusive musical masters conveyed by Prime to F2K fall within the subject matter of the Copyright Act.

***5** For the general scope requirement of the test to be satisfied, "the challenged act must by itself, infringe one of the exclusive rights provided by federal copyright law through reproduction, adaptation, performance, distribution, or display." Melendez, 50 F.4th at 307 (citation omitted). This prong requires courts to holistically assess the state law claim to determine whether it contains an "extra element" that makes it "qualitatively different from a copyright infringement claim." Id. (citation omitted).

Prime's breach of contract and unjust enrichment claims do not meet the general scope requirement for preemption. In those claims, Prime does not seek to enforce exclusive rights of reproduction or distribution under § 106 against 43 North. The FAC affirmatively disclaims any dispute over copyright ownership. Instead, Prime alleges that 43 North voluntarily assumed a contractual obligation -- through the 43 North–F2K APA, the Assignment and Assumption

Agreement, and the October 13, 2015 letter -- to remit royalty payments to Prime for its exercise of rights regarding Prime's non-exclusive musical masters, and 43 North has breached that obligation. The unjust enrichment claim, pled in the alternative, is similarly predicated on F2K's failure to pay those contractually required royalties.

As the Second Circuit has recognized, "[t]here are several qualitative differences between such a contract claim and a copyright violation claim," including the fact that the Copyright Act does not provide an express right to receive payment for use of a copyrighted work. Forest Park Pictures v. Universal Television Network, Inc., 683 F.3d 424, 431 (2d Cir. 2012). Unlike a plaintiff suing for copyright infringement, a plaintiff suing for failure to pay under a contract must prove "extra elements," such as the existence and breach of a promise to pay. Id. Consequently, Prime's claim that 43 North breached a contract "including a promise to pay is qualitatively different" from a claim "to vindicate a right included in the Copyright Act." Id. at 433.

43 North contends that Prime's contract and unjust enrichment claims are clearly preempted because they are aimed at stopping 43 North's use and exploitation of copyrighted works. But Prime does not dispute that 43 North has the right to use and exploit the works. Rather, Prime alleges that, in acquiring those rights, 43 North also assumed F2K's contractual obligations to third parties with royalty-bearing rights. Prime seeks to enforce those contractual obligations, not to stop 43 North's use of the copyrighted works.

## III. Failure to State a Claim

Lastly, 43 North argues that Count I -- breach of contract as to Prime's non-exclusive musical masters -- fails to state a claim because Prime is not an intended third-party beneficiary of the 43 North–F2K APA or the accompanying Assignment and Assumption Agreement. In opposition, Prime contends that, in addition to being a third-party beneficiary of the 43 North-F2K APA, it also has a direct right to enforce the PEG-F2K APA against 43 North because 43 North assumed F2K's obligations under that contract.

Pursuant to their choice-of-law provisions, the 43 North-F2K APA is governed by New York law, while the PEG-F2K APA is governed by Louisiana law. In both states, however, where a successor expressly assumes a predecessor's obligations under a contract, the original counterparty to that contract may enforce the contract directly against the successor. See, e.g., Hellman v. Samuel Goldwyn Prods., 26 N.Y.2d 634, 634-36 (1970); Giles v. Oak Lane Mem'l Park, LLC, 290 So. 3d 685, 695 (La. App. 1 Cir. Nov. 15, 2019). The PEG-F2K APA itself contemplates this in § 21.1, which provides that the agreement is "intended to confer rights or remedies ... on ... the parties hereto and their respective permitted successors and assigns." F2K's "permitted successors and assigns" include 43 North, given the FAC's allegation -- supported by the 43 North–F2K APA itself -- that 43 North acquired F2K's interests in the relevant recordings and assumed F2K's obligations.

***6** The 43 North–F2K APA's assumption language is broad. Section 1.01(c) provides that 43 North acquired "[a]ll other agreements ... pertaining to" the master sound recordings, and § 5.03(a) provides that 43 North assumed "all third party royalty obligations created by the [c]ontracts by virtue of the income derived" from the acquired recordings. The Assignment and Assumption Agreement memorializes 43 North's assumption of "all liabilities and obligations" of F2K arising under the assumed contracts. The PEG-F2K APA, which governs F2K's exploitation of the recordings to which 43 North acquired rights and which imposes a fifty-percent royalty obligation in Prime's favor, plausibly falls within those broad assumption provisions. Consequently, Prime has plausibly alleged that the PEG-F2K APA was assumed by 43 North as F2K's successor and that Prime, as the original counterparty to that agreement, may enforce its terms against 43 North directly.

In reply, 43 North argues that Prime cannot advance the theory of direct enforcement of the PEG-F2K APA because the FAC characterizes Count I as a breach of the 43 North-F2K APA brought by Prime as its third-party beneficiary. But federal pleading rules do not require a plaintiff to identify the legal theory on which it seeks recovery; they require only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint is not subject to dismissal merely because it invoked one legal label rather than another, so long as the facts pleaded support a plausible claim. See Wynder v. McMahon, 360 F.3d 73, 77 (2d Cir. 2004) ("[F]ederal pleading is by statement of claim, not by legal theory." (citation omitted)); Albert v. Carovano, 851 F.2d 561, 571 n.3 (2d Cir. 1988) (en banc) ("The failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of the claim. Factual allegations alone are what matters."). The relevant question is whether the facts alleged, taken as true and viewed most favorably to Prime, state a claim upon which relief can be granted. It is clear that they do.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

The FAC specifically alleges that Prime and F2K entered the PEG-F2K APA in March 2002; that the PEG-F2K APA imposed ongoing royalty obligations on F2K, including a perpetual fifty percent (50%) participation in net receipts; that the PEG-F2K APA "was binding on F2K, as well as on any of its successors and assigns, including 43 North"; and that 43 North, through the 43 North-F2K APA and the appended Assignment and Assumption Agreement, "became a successor-in-interest to the obligations ... that had been entered into by F2K" with respect to Prime's nonexclusive musical masters. Those allegations supply the factual predicate for Prime's direct-enforcement theory. That the FAC labeled Count I as a "breach of contract by third-party beneficiary" does not preclude Prime from arguing, on the same facts, that it has a direct contractual right to enforce the PEG-F2K APA against 43 North. Given this, it is unnecessary to assess the adequacy of Prime's pleading of third-party beneficiary status. The motion to dismiss Count I under Rule 12(b)(6) for failure to state a claim is denied.[7]

## Conclusion

43 North's January 28, 2026 motion to dismiss the FAC is granted in part. Counts II and IV of the FAC are dismissed under Rule 12(b)(1), Fed. R. Civ. P. The motion is otherwise denied.

## All Citations

Slip Copy, 2026 WL 1329491

### Footnotes

1 A district court cannot consider new factual allegations contained in declarations submitted in opposition to a motion to dismiss. See Faulkner v. Beer, 463 F.3d 130, 134 n.1 (2d Cir. 2006). It may, however, consider the full text of documents partially quoted in the complaint, the contracts that were allegedly breached, and documents relied upon by plaintiff in drafting the complaint. Id. at 134. The Court therefore relies on the Declaration of Leonard Fico only to the extent that it authenticates the exhibits attached thereto, which include contracts, letters, and emails that were described in, but not attached to, the FAC.

2 F2K was then owned and operated by Leonard C. Fico.

3 Prior to filing the FAC, Prime was warned that it was not likely to have another opportunity to amend.

4 The doctrine of standing involves both constitutional and prudential limits on federal court jurisdiction. Although 43 North invokes Rule 12(b)(1), its argument is solely directed to prudential standing rather than Article III. Even if it did challenge Prime's Article III standing, however, a court can "assume Article III standing and address 'the alternative threshold question' of whether a party has prudential standing." United States v. Suarez, 791 F.3d 363, 366 (2d Cir. 2015) (citation omitted).

5 To be clear, only owners of copyrights or those granted exclusive licenses by copyright owners have standing to sue for copyright infringement, Urbont v. Sony Music Entm't, 831 F.3d 80, 88 n.6 (2d Cir. 2016) (citing 17 U.S.C. § 501(b)), and with respect to the GCM Catalog, Prime is neither. As discussed in Section II infra, however, Prime's claims sound in contract, not copyright infringement.

6 While the FAC also relied on a theory that Prime was an "administrator of" the GCM Catalog, Prime does not rely on this theory in opposition to the motion to dismiss. The term "administrator" as used in Fed. R. Civ. P. 17(a)(1)(B) typically refers to a fiduciary representative of an estate, rather than a business affairs representative. See, e.g., Hartke v. Bonhams & Butterfields Auctioneers Corp., No. 22-cv-3571, 2024 WL 246139, at *6 (S.D.N.Y. Jan. 23, 2024).

7 Should 43 North so move, Count III may be subject to dismissal for failure to state a claim. Unjust enrichment "is not a catchall cause of action to be used when others fail." Corsello v. Verizon N.Y., Inc., 18 N.Y.3d 777, 790 (2012). Consequently, an unjust enrichment claim "is not available where it simply duplicates, or replaces, a conventional contract or tort claim." Id. (citation omitted). "Two claims are duplicative of one another if they arise from the same facts ... and do not allege distinct damages." NetJets Aviation, Inc. v. LHC Commc'ns, LLC, 537 F.3d 168, 175 (2d Cir. 2008) (citation omitted).

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.